755 A.2d 1287

**LOBOLITO, INC., Appellant,**

v.

**NORTH POCONO SCHOOL DISTRICT, Appellee.**

Supreme Court of Pennsylvania.

Argued Jan. 31, 2000.

Decided July 31, 2000.

Charles B. Zwally, Harrisburg, Guy P. Beneventino, for Lobolito, Inc.

William J. Rinaldi, Scranton, for North Pocono School Dist.

Before FLAHERTY, C.J., ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN, SAYLOR, JJ.

## OPINION

NIGRO, Justice.

We granted allocatur to determine whether an agreement to build a new school, entered into by a school board at the expiration of its term, is binding on the successor school board. For the reasons that follow, we affirm in part and reverse in part.

On May 15, 1991, Lobolito, Inc., (Lobolito) and the school board of the North Pocono School District (School District) entered into a written agreement, entitled "Joint Development Agreement." Under this initial agreement, Lobolito proposed to construct, own and operate a sewage treatment plant (STP). The STP would provide sewage disposal services to a new elementary school that the School District proposed to construct on eighteen acres of its own property located in Clifton Township. The STP would also provide sewage disposal services to a residential subdivision, which Lobolito would construct on 220 acres of its own property located in Lehigh Township. Pursuant to the Joint Development Agreement, over the next several years, Lobolito and the School District proceeded to obtain and share the costs of the necessary planning and permit approvals for the proposed STP.

In November of 1994, a new majority of the school board was elected. On December 7, 1994, while still awaiting the approval of needed permits, Lobolito and the old school board entered into a second written agreement, entitled "Memorandum of Agreement"—the agreement at issue in the present appeal. Based on the record before this Court, it appears that the newly elected board members were not yet in place at the time of the second agreement.

This second agreement changed the proposed location of the STP, altered the financing arrangements of the Joint Development Agreement and revised the terms of the STP's service obligations to the new elementary school. It also terminated the Joint Development Agreement.[1] In the Memorandum of Agreement, the School District promised to "proceed with the

---

1. The Commonwealth Court found that the Memorandum of Agreement terminated and replaced the Joint Development Agreement. *See Lobolito v. North Pocono Sch. Dist.,* 722 A.2d 249, 252 n. 4 (Pa. Commw.Ct.1998). While Lobolito challenges this finding, we agree with the Commonwealth Court that since the Memorandum of Agreement expressly stated that upon its delivery "the School District and Lobolito shall terminate the Joint Development Agreement," the latter agreement terminated and replaced the former. *See id.;* Memorandum of Agreement ¶ 8. For purposes of this appeal, therefore, the Memorandum of Agreement is the only agreement at issue—that is, the only agreement under which Lobolito may be entitled to relief.

School District Project, subject to all regulations and laws by which it is governed." Memorandum of Agreement ¶ 7. Under this agreement, Lobolito and the School District would no longer share costs associated with attaining the remaining approvals and permits. Rather, the parties agreed that "all costs incurred in the connection with obtaining permits and approvals for the proposed sewage treatment plant shall be paid by Lobolito ... and shall be recovered by rates and charges as set forth in the Service Agreements...." Memorandum of Agreement ¶ 8. Lobolito claims to have incurred substantial costs after the execution of the Memorandum of Agreement in attempting to acquire the necessary approvals and permits.

Approximately one year after the execution of the Memorandum of Agreement and the school board election, the School District adopted a resolution promulgated by the successor school board which provided that the elementary school would not be built and that, even if it were built, it would not utilize the proposed STP for sanitary sewage disposal services. Believing that the resolution breached its agreement with the School District, Lobolito filed a cause of action seeking to recover its costs and lost profits.

The School District responded by filing preliminary objections in the nature of a demurrer, claiming, *inter alia,* that Lobolito's Complaint failed to state an actionable claim because the School District's new school board, which Lobolito alleges to have breached the agreement, cannot be bound by a contract executed by the predecessor school board. The trial court granted the School District's preliminary objections and dismissed the case with prejudice. On appeal, the Commonwealth Court affirmed, finding that the succeeding school board could not be bound by a contract executed by the predecessor board which encompassed a governmental as opposed to a proprietary function. *Lobolito v. North Pocono Sch. Dist.,* 722 A.2d 249, 251–53 (Pa.Commw.Ct.1998).[2]

2. We note that in the law of pleading it is axiomatic that preliminary objections in the nature of a demurrer admit as true all well and clearly pleaded material, factual averments and all inferences fairly deducible

This Court has long viewed agreements involving governmental bodies in a different light than agreements made exclusively between private parties. Since the mid-nineteenth century, we have distinguished between agreements encompassing governmental functions of governing bodies from agreements encompassing proprietary or business functions. *See Western Saving Fund Soc'y of Philadelphia v. City of Philadelphia*, 31 Pa. 175, 183 (1858) (distinguishing governmental contracts, or contracts encompassing "things public," from proprietary contracts, or contracts encompassing "things of commerce").[3]

With respect to those agreements involving municipal or legislative bodies that encompass governmental functions, we have repeatedly held that governing bodies cannot bind their successors. *See, e.g., Mitchell v. Chester Housing Auth.*, 389 Pa. 314, 328, 132 A.2d 873, 880 (1957); *Commonwealth ex rel. Fortney for Use of Volunteer Fire Dep't v. Bartol*, 342 Pa. 172, 174–75, 20 A.2d 313, 314 (1941); *Born v. City of Pittsburgh*,

therefrom. *Sinn v. Burd*, 486 Pa. 146, 149, 404 A.2d 672, 673–74 (1979). Conclusions of law and unjustified inferences are not admitted by the pleadings. *Lerman v. Rudolph*, 413 Pa. 555, 557, 198 A.2d 532, 533 (1964). Starting from this point of reference, "the complaint must be examined to determine whether it sets forth a cause of action which, if proved, would entitle the party to the relief sought. If such is the case, the demurrer may not be sustained." *Sinn*, 486 Pa. at 149, 404 A.2d at 674. Assuming the truthfulness of the pleaded allegations delineated above, therefore, we must determine whether Lobolito can recover from the School District under any theory set forth in its Complaint.

3. The historical basis for this distinction stems from the nineteenth-century view that local governmental bodies or municipal corporations were both private corporations that engaged in proprietary actions and public entities that performed governmental functions. In those days, it was commonplace for municipalities to be involved in proprietary enterprises such as constructing wharves, building jetties, operating markets and entering into all types of joint ventures with the private sector. Agreements entered into by the municipalities that encompassed these business functions, therefore, were naturally viewed as distinct from those agreements that encompassed the municipalities' police powers or other interests and functions of general public importance. *See* Janice G. Griffith, *Local Government Contracts: Escaping the Governmental/Proprietary Maze*, 75 Iowa L. Rev. 277, 280–300 (1990) (discussing historical development of governmental-proprietary distinction made by early state courts).

266 Pa. 128, 132–33, 109 A. 614, 615 (1920); *Moore v. Luzerne County*, 262 Pa. 216, 220–22, 105 A.2d 94, 94–96 (1918).[4] In *Fortney* we explained:

> In the performance of sovereign or governmental, as distinguished from business or proprietary, functions, no legislative body, or municipal board having legislative authority, can take action which will bind its successors. It cannot enter into a contract which will extend beyond the term for which the members of the body were elected.

*Commonwealth ex rel. Fortney*, 342 Pa. at 175, 20 A.2d at 314 (citations omitted).

In *Mitchell*, we described the public policy behind this rule of law in the following terms:

> The obvious purpose of the rule is to permit a newly appointed governmental body to function freely on behalf of the public and in response to the governmental power or body politic by which it was appointed or elected, unhampered by the policies of the predecessors who have since been replaced by the appointing or electing power. To permit the outgoing body to 'hamstring' its successors by imposing upon them a policyimplementing [sic] and to some extent, policymaking [sic] machinery, which is not attuned to the new body or its policies, would be to most effectively circumvent the rule.

*Mitchell*, 389 Pa. at 324, 132 A.2d at 878.[5]

Our Court has noted only one exception to the general rule against binding governmental successors. In *MacCalman v.*

4. *See also In re Jones*, 505 Pa. 50, 68, 476 A.2d 1287, 1296 (1984) (discussing analogous rule that one governmental body cannot determine composition of its successors); *Scott v. Philadelphia Parking Auth.*, 402 Pa. 151, 157–59, 166 A.2d 278, 282–83 (1960) (discussing governmental-proprietary distinction in municipal contracts).

5. The rule against binding governmental successors is recognized in most other jurisdictions as well. *See* EUGENE McQUILLIN, THE LAW OF MUNICIPAL CORPORATIONS, § 29.101 (3d ed.1990) (discussing unenforceability of municipal contracts that bind successors and citing cases from many states); *see also* Griffith, *supra* note 3, at 305–28 (discussing approaches of states in applying governmental-proprietary test); RESTATEMENT (SECOND) OF CONTRACTS § 8 cmt. c (1981) (discussing English

*County of Bucks,* 411 Pa. 316, 191 A.2d 265 (1963), Bucks County through its commissioners entered into a long-term contract with a water and sewage treatment authority. The aim of the contract was to provide safer sewage treatment and water to nine municipalities within the county and it was executed after comprehensive independent studies indicated that the county's public water and sewage facilities were wholly inadequate. Several property owners challenged the validity of the contract, arguing that it bound future county commissioners. The lower court found the contract to be enforceable. We agreed with the lower court's assessment that:

> if the [contract] is 'deemed to constitute a contractual impairment or limitation upon future county commissioners in a legislative or governmental function, then we . . . believe that considerations of urgency and necessity, especially when coupled with the stipulated public interest and absence of bad faith or ulterior motivation, should permit the commitment to be sustained as an exception to the general rule.'

*MacCalman,* 411 Pa. at 321, 191 A.2d at 267 (quoting Court of Common Pleas of Bucks County, No. 715 December Term, 1962, Satterthwaite, J.).[6]

common law basis for unenforceability of certain government contracts).

6. Lobolito correctly observes that a short line of our cases which involve government contracts do not discuss the governmental-proprietary distinction and make seemingly unequivocal pronouncements that all government contracts can bind successors. *See Altman v. School Dist. of City of Uniontown,* 334 Pa. 336, 339–40, 5 A.2d 896, 897 (1939); *Horvat v. Jenkins Township Sch. Dist.,* 337 Pa. 193, 195–96, 10 A.2d 390, 391 (1940) (citing *Altman* ); *Detweiler v. School Dist. of Borough of Hatfield,* 376 Pa. 555, 567–68, 104 A.2d 110, 117 (1954) (citing *Horvat* and *Altman* ). Since it appears that the successor municipal authorities involved in those cases never challenged the enforceability of the contracts on the basis of the governmental-proprietary distinction, and since that distinction is never discussed in those cases, we find them inapplicable here. To the extent that those cases can be read to suggest that municipal or legislative bodies can bind their successors to contracts encompassing governmental functions, we decline to follow them.

The most contemporary illustrations of the governmental-proprietary distinction come from the Commonwealth Court. That court has recently explained, for example, that a multi-year custody and securities lending agreement between the Commonwealth's treasurer and a bank encompasses a governmental function (safekeeping the Commonwealth's assets) and thus was unenforceable against the succeeding Commonwealth treasurer. *State Street Bank & Trust Co. v. Commonwealth Treasury Dep't,* 712 A.2d 811, 815 (Pa.Commw.Ct.1998). The Commonwealth Court has also explained that an employment contract between a township's supervisors and a police chief encompasses a governmental function (ensuring public safety) and thus was unenforceable against future supervisors who wanted to appoint a new police chief. *Falls Township v. McManamon,* 113 Pa.Cmwlth. 504, 537 A.2d 946, 947 (1988). The Commonwealth Court has also found, however, that a contract between a county's commissioners and a private contractor to operate a free-standing drug and alcohol treatment facility encompassed a proprietary and not a governmental function, and thus could be enforced against successor commissioners. *County of Butler v. Local 585,* 158 Pa. Cmwlth. 519, 631 A.2d 1389, 1393 (1993).

 Applying these principles to the case at bar, we must determine whether the Memorandum of Agreement encompassed a proprietary or governmental function. We first note, as the Commonwealth Court observed below, that the Memorandum of Agreement cannot reasonably be construed only as an agreement to provide sewage treatment services, which is arguably a proprietary function. *See Lobolito v. North Pocono Sch. Dist.,* 722 A.2d 249, 253 (Pa.Commw.Ct.1998). Unless the school was built, no sewage disposal services would be necessary. Thus, the driving force behind the Memorandum of Agreement was construction of the new school. The services aspect of the agreement would be devoid of meaning without the school board's predicate promise to build the school.

Having found the crux of the Memorandum of Agreement to be the construction of a new school, we turn to the question of

whether such a purpose constitutes a governmental function. We find that it does. The creation and operation of public schools have traditionally been governmental functions in Pennsylvania. Our Commonwealth's Constitution expressly charges the General Assembly with the duty to "provide for the maintenance and support of a thorough and efficient system of public education...." Pa. Const. Art. III, § 14. Moreover, our courts have noted that the right to education is a statutory entitlement in Pennsylvania and that the government has a duty to provide for and enable public education. *See Lisa H. v. State Bd. of Educ.*, 67 Pa.Cmwlth. 350, 447 A.2d 669, 673 (1982).

There can be no doubt that the government needs to create schools in order to satisfy its duty to provide education for the Commonwealth's youth. Indeed, the Public School Code gives local school boards the exclusive authority to decide whether and where to establish new schools. The Code provides that "[t]he board of school directors of each district shall provide the necessary grounds and suitable school buildings to accommodate all of the children between the ages of six and twenty-one years, in said district, who attend school." Section 701 of the Public School Code of 1949, Act of March 10, 1949, P.L. 30, *as amended*, 24 P.S. § 7–701. The decision to build a school, therefore, is a traditional governmental function and, under the Public School Code, a function that comes under the exclusive province of local school boards. *Id.*

Given that the authority to build schools rests with local boards and that decisions concerning the creation and operation of schools is a basic governmental function, we find that the successor school board was not obligated to honor the agreement entered into by the predecessor school board and Lobolito.[7] To require such a contract to be enforced would be to inappropriately compel the successor board to either follow the governmental policies of its predecessor or be faced with

7. We note that if the successor school board wanted to continue with the school project, it could have continued with the contract simply by ratifying it. There can be no doubt here, however, that the successor board's December 1995 resolution clearly expressed its desire to abandon the school project and thus avoid the contract with Lobolito.

substantial liability, including the possibility of consequential damages, for merely seeking to implement its own policies. We are particularly concerned about allowing such a result in cases such as this one, where the old board entered into a new agreement after an election but before the newly-elected board members took office. *See Mitchell v. Chester Hous. Auth.*, 389 Pa. 314, 316–17, 132 A.2d 873, 874 (1957) (noting concern about midnight contracts by ousted or about-to-be-ousted government officials); *State Street Bank & Trust Co. v. Commonwealth Treasury Dep't*, 712 A.2d 811, 815 (Pa. Commw.Ct.1998) (same).

In finding that the successor school board was entitled to disavow the Memorandum of Agreement, we affirm the granting of the preliminary objections with regard to those counts in which Lobolito avers breach of contract and seeks lost profits. Such a finding, however, does not preclude Lobolito from recovering its out-of-pocket costs under an equitable theory of relief. Because this case was dismissed in its entirety at the preliminary objection stage, the appropriate inquiry is whether Lobolito's Complaint "sets forth a cause of action which, if proved, would entitle the party to the relief sought." *Sinn v. Burd*, 486 Pa. 146, 149, 404 A.2d 672, 674 (1979).[8]

 In the present case, the underlying facts set forth in the Complaint provide for the possible recovery of damages based upon promissory estoppel.[9] In its Complaint, Lobolito averred that it "proceeded with the permitting and approvals for the proposed STP in reliance upon the School District's

8. Our scope of review of this matter is plenary since the trial court dismissed Lobolito's Complaint for failure to state a cause of action upon which relief may be granted. *See Renziehausen v. Township of Robinson*, 531 Pa. 154, 158, 611 A.2d 706, 709 (1992).

9. Promissory estoppel provides an avenue of recovery where "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." *Thatcher's Drug Store v. Consolidated Supermarkets*, 535 Pa. 469, 476, 636 A.2d 156, 160 (1994) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 90(1), which has been adopted as the law in Pennsylvania).

obligation to use the same." Complaint ¶ 42. It also averred that through this action it sought to recover certain damages, including "costs and expenses [incurred] . . . for the purpose of obtaining planning approvals for the proposed STP." Complaint ¶ 43(a). In essence, Lobolito averred that, given its dealings with the School District since the 1991 Joint Development Agreement, it relied on the board's promises and, to its detriment, expended substantial money after the execution of the Memorandum of Agreement in proceeding with the STP project. Since these allegations outline a theory of recovery in promissory estoppel the Complaint should survive the preliminary objection stage. *See Sinn,* 486 Pa. at 149, 404 A.2d at 674 (demurrer cannot be sustained where cause of action entitling plaintiff to relief is properly pled); *Fraternal Order of Police, E.B. Jermyn Lodge # 2 v. Hickey,* 499 Pa. 194, 200, 452 A.2d 1005, 1008 (1982) (explaining that "application of the theory of estoppel . . . does not conflict with the principle that one administration will not be permitted to bind its successor").

While we hold that promissory estoppel may provide a theory of recovery for Lobolito under these facts, we do not hold that at this early stage of the litigation that Lobolito is entitled to recover damages.[10] The determination to award relief involves questions of fact concerning the reasonableness of Lobolito's reliance as well as the establishment of actual losses, questions which must be answered by the trier of fact. We therefore affirm the decision of the Commonwealth Court to the extent it determined that the contract at issue encompassed a governmental as opposed to a proprietary function. We nevertheless reverse the Commonwealth Court's decision affirming the trial court's dismissal of Lobolito's Complaint

10. We note that in pursuing damages under promissory estoppel, Lobolito shall be limited to recovering the amount of money it expended in reliance on the school board's promise. *See Banas v. Matthews Int'l Corp.,* 348 Pa.Super. 464, 486 n. 12, 502 A.2d 637, 648 n. 12 (1985) (under promissory estoppel a promisee's recovery is ordinarily "limited to recovery of the amounts lost and expended in reliance on the promise"); RESTATEMENT (SECOND) OF CONTRACTS § 90(1) (remedy under promissory estoppel may be "limited as justice requires").

and remand for further proceedings consistent with this opinion.

Justice ZAPPALA concurs in the result.